SERENA DANIELS, Petitioner-Appellant, v. THE POLICE BOARD OF THE CITY OF CHICAGO *et al.*, Respondents-Appellees.—CARL CARTER, Petitioner-Appellee, v. THE POLICE BOARD OF THE CITY OF CHICAGO *et al.*, Respondents-Appellants.

First District (4th Division)   Nos. 1—01—2419, 1—01—2495 cons.

Opinion filed May 1, 2003.—Rehearing denied May 2, 2003.

Law Offices of Joseph V. Roddy, of Chicago (Joseph V. Roddy and Tamara L. Cummings, of counsel), for Serena Daniels and Carl Carter.

Mara S. Georges, Corporation Counsel, of Chicago (Lawrence Rosenthal, Benna Ruth Solomon, and Myriam Zreczny, Assistant Corporation Counsel, of counsel), for Police Board of the City of Chicago et al.

JUSTICE KARNEZIS delivered the opinion of the court:

On June 4, 1999, Chicago police officer Serena Daniels fatally shot Latanya Haggerty following a car chase. Chicago Police Department Superintendent Terry Hillard (the superintendent) filed charges with the Police Board of the City of Chicago (the Board) alleging that Daniels and three other police officers, Carl Carter, Michael Williams and Stafford Wilson, violated police department rules in connection with the chase and shooting. The Board found the officers guilty of violating the department's rules and discharged Daniels, Williams and Wilson from their duties as police officers and suspended Carter from his duties for one year. Upon administrative review, the trial court affirmed Daniels' discharge, reversed Carter's suspension, and remanded Wilson's and Williams' cases back to the Board for new hearings. Daniels appeals from the trial court's order affirming the Board's decision to discharge her. In a related case consolidated on appeal with Daniels' action, the superintendent appeals the trial court's order reversing the Board's decision to suspend Carter.

On appeal, Daniels argues that (1) the Board's findings that she was unjustified in her use of deadly force, disobeyed orders to terminate a chase, and failed to report that the officers fired their weapons in an earlier incident were against the manifest weight of the evidence; and (2) the Board's consolidation of all four cases, negative pretrial publicity and failure of the Board members to attend the administrative hearing deprived her of her right to be tried fairly. The

superintendent argues that (1) the Board's findings that Carter failed to immediately report a weapon discharge incident, disregarded orders to terminate the chase, and falsely informed the police department that Raymond Smith had threatened officers with his vehicle were not against the manifest weight of the evidence; and (2) the Board's decision to suspend Carter was not arbitrary, unreasonable or unrelated to the requirements of service. We affirm the court's order affirming Daniels' discharge and reverse the court's order with regard to Carter and reinstate Carter's suspension.

## FACTS

Outlined briefly, the facts are as follows. On June 4, 1999, Raymond Smith picked Haggerty up after work and drove to the south side of Chicago. At approximately 5 p.m., Smith stopped his car to speak to a friend standing on the sidewalk. Sixth District police officer Daniels and her partner Williams pulled up beside Smith's car in their squad car (Beat 632). Williams was driving and Daniels was in the passenger seat. Daniels asked Smith for his driver's license and insurance certification. Smith drove off without producing either document.

Beat 632 followed Smith's car and stopped it one block south. Having checked the license plates on Smith's car, the officers knew that the plates were not registered to the car. The officers reiterated their request for Smith's license and insurance information, but Smith again drove off without producing either. Beat 632 pursued Smith's car. After following Smith's car for approximately 15 blocks, Daniels notified the police department's Office of Emergency Communications (OEC) that Beat 632 was following Smith's vehicle. When questioned by the OEC dispatcher, Daniels denied that Beat 632 was "chasing" Smith's car.

Beat 632 ultimately pursued Smith's car for 30 blocks to the intersection of 95th Street and Cottage Grove Avenue, where Smith's car finally stopped when it was cut off by Beat 634. Beat 634 was driven by Carter. Carter's partner, Wilson, was in the passenger seat. Carter's police radio was broken, but he and Wilson heard Beat 632's report of the pursuit over Wilson's radio and decided to assist Beat 632. After Smith stopped, the four officers exited their cars and approached Smith's car with their weapons drawn. They ordered Smith to exit his car but he refused to do so. Instead, he backed his car up between the two squad cars and, driving in reverse, fled westbound on 95th Street. Officers Daniels, Williams and Wilson fired at the retreating car. Although the officers would later claim that they fired their weapons because Smith tried to run them down, two independent witnesses standing close to the intersection stated that Smith's car never

threatened the officers. In contrast to the officers' testimony, the witnesses and Smith stated that the car never advanced toward the officers and that it drove backwards on 95th Street rather than in a forward direction.

At the first intersection, Smith turned his car forward and sped north with Beats 632 and 634 in active pursuit. Daniels contacted OEC and informed the dispatcher of the pursuit and that shots had been fired and called out the intersections that Beat 632 passed during the beginning of the chase. Daniels testified that she reported "police shots fired" or "632, 634 shots fired" but the dispatcher did not hear the "shots fired" report. The other three officers did not report that shots had been fired or that they had discharged their weapons. Therefore, neither the dispatcher nor the OEC supervisor, Sergeant Bednarek, was aware that shots had been fired or that Beat 634 was also involved in the pursuit. Sergeant Bednarek ordered the dispatcher to inform Beat 632 to terminate the chase if the car was only wanted "for traffic," *i.e.*, a traffic violation. The dispatcher conveyed the order to terminate to Beat 632, which Daniels acknowledged.

The transcripts of the taped OEC call show that the communications between Beat 632 and OEC were garbled, interrupted and hard to understand. The transcript of the tape prepared by the department's Office of Professional Standards (OPS) notes "possibly 'shots fired' " at the salient point in the transcript. After listening to the tape of the call several times, the dispatcher acknowledged that, although he had not heard "shots fired" when the call came in, "shots fired" "could be" on the tape and that it "sounded like it." Sergeant Bednarek testified that, although he had listened to the taped response from Beat 632 at least four or five times, he really could not understand what was being said. The salient portion of the OPS transcript shows the following communications:

"Dispatch: Alright. 632 is following a car eastbound on 95th past Prairie at this time. A male driver of a grey car is refusing to pull over at this time.

Bt. 620 [Sgt. Bednarek]: Okay, 1-4 squad. [W]here are they at now and what's he wanted for?

Dispatch: Alright, 632 talk to 620. 632?

Bt. 632: ([G]arbled response. [P]ossibly 'shots fired')

Dispatch: 632?

Bt. 632: Westbound on Nine Five. Car went around down Langley on Nine Five.

Dispatch: Okay, it went southbound on Langley from 95. 620 is requesting what is he wanted for?

Bt. 632: ([G]arbled response)

Dispatch: That car is southbound on Langley from 95th Street, southbound on Langley from 95th St.

Bt. 632: ([G]arbled statements)

Bt. 620: What's that car wanted for? If it's just wanted for traffic and it's still going, tell them to stop chasing.

Dispatch: 632, you copy? 632, 620 said if it's for traffic only, cut it off.

Bt. 632 [Daniels]: St. Lawrence . . . bound.

Dispatch: Alright. Alright. Southbound on St. Lawrence. I believe St. Lawrence is a one-way.

Bt. 632: Eastbound 90th from St. Lawrence.

Dispatch: Eastbound 90th from St. Lawrence. 632, 620 said terminate the .... Terminate it.

Bt. 632: 10-4."

The dispatcher and Sergeant Bednarek believed that the pursuit was over because they heard no further communication from Beat 632. However, although Daniels and Williams heard the termination order, they continued their pursuit. Carter and Wilson also continued pursuit, subsequently claiming that they did not hear the termination order. The pursuit continued for another four or five minutes and the chase left the boundaries of the 6th District and entered the 3rd District. Daniels claimed to have continued broadcasting Beat 632's locations but no such communications are reflected on the transcripts of the tape. The 3rd and 6th Districts do not share radio frequencies. Therefore, even had Daniels continued broadcasting the pursuit locations, 3rd District personnel would not have been able to hear those communications and would not have known that a chase was in progress through their district.

Smith finally stopped his car at 64th Street and Dr. Martin Luther King Jr. Drive. Carter and Williams removed Smith from the car and subdued him. Daniels moved into position next to the rear driver side door of Smith's car, and Wilson stood to the rear of the passenger side of the car. Daniels repeatedly ordered Haggerty, who was talking on a cell phone, to put the phone down, show her hands and exit the car. Wilson also ordered Haggerty to let him see her hands. Haggerty ignored the yelled instructions and continued to talk on the phone. Daniels testified later that she saw a silver object slowly rising from between the side of the passenger door and Haggerty's thigh and that Haggerty turned toward her. Thinking the silver object was a gun barrel, Daniels shot once. The bullet pierced Haggerty's lungs, liver and heart and ultimately killed her. No gun was found at the scene. A silver padlock was found on the car floor in front of the front passenger seat. Wilson later stated that, when he pulled Haggerty's body

from the car, "something silver" fell from Haggerty's lap to the floor. Wilson had not been able to see Haggerty's right hand from his position and had not seen Haggerty move except to tilt her head to the phone.

When police department supervisors and investigators arrived on the scene, Daniels, Carter, Williams and Wilson did not inform them that shots had been fired earlier at 95th Street and Cottage Grove Avenue. Although Carter stated that he told Sergeant Bednarek and Commander Mark Davis at the scene at 64th Street about the earlier shootings at 95th Street, Bednarek and Davis denied this. Not until the four officers were at Area 2 headquarters did they inform supervisors of what had occurred at 95th Street and Cottage Grove Avenue.

Following an investigation, the superintendent filed charges with the Board against Daniels, Wilson, Williams and Carter, charging Daniels with 18 counts and Carter with 14 counts of violating police department rules. The Board held a hearing, presided over by a hearing officer, to investigate the charges against the four officers. The Board members did not attend the hearing. After the six-day hearing, the Board conferred with the hearing officer, examined the evidence presented during the hearing and adopted the hearing officer's findings.

The Board found Daniels guilty of violating Rule 2 (any action or conduct that impedes the Department's efforts to achieve its policy or goals or brings discredit upon the Department) and Rule 6 (disobedience of an order or directive, whether written or oral) for:

(1) failing to report shots fired by police at 95th Street and Cottage Grove Avenue in violation of General Orders 99—01 V(A)(1)(a) and (V)(B)(1);

(2) violating a direct order to terminate a vehicle chase;

(3) firing her weapon without justification at a fleeing vehicle in violation of General Order 86—8 IV (E);

(4) shooting Haggerty without justification in violation of General Orders 86—8 III(A)(1), III(A)(2), III(A)(3) and III(B); and

(5) with regard to the shooting at 95th and Cottage Grove Avenue, failing to make certain reports required following the discharge of a weapon in violation of General Orders 99—01 V(A)(3) and V(B)(1).

The Board also found Daniels guilty of violating Rule 2 and Rule 38 (unlawful or unnecessary use or display of a weapon for:

(1) firing her weapon at a fleeing vehicle without justification thereby unlawfully or unnecessarily using or displaying her weapon; and

(2) shooting Haggerty without justification resulting in a fatal gunshot wound.

The Board ordered that Daniels be discharged from her duties as a police officer.

The Board found Carter guilty of violating Rule 2 and Rule 6 for: (1) failing to report shots fired by police at 95th Street and Cottage Grove Avenue in violation of General Order 99—01 (V)(B)(1); (2) violating a direct order to terminate a vehicle chase; and (3) with regard to the shooting at 95th and Cottage Grove Avenue, failing to make certain reports required following the discharge of a weapon in violation of General Order 99—01 V(B)(1). The Board also found Carter guilty of violating Rule 2 and Rule 14 (making a false report, written or oral) for giving false information to his OPS when he stated that Smith used his vehicle as a weapon against the officers. The Board ordered that Carter be suspended from his duties for one year.

The Board found Williams and Wilson guilty of assorted rules violations and ordered that they be discharged from their duties.

The trial court granted administrative review of the Board's decisions and affirmed Daniels' discharge, reversed Carter's suspension, and ordered that Wilson's and Williams' cases be remanded to the Board for new hearings. The court made its orders regarding Daniels and Carter final and appealable. Daniels timely appealed the court's order affirming her discharge and the superintendent timely appealed the court's order reversing Carter's suspension. The trial court's order remanding Williams' and Wilson's cases to the Board for new hearings is not before us.

## ANALYSIS

■ As the reviewing court, we review the decision of the Board, not that of the trial court. *Krocka v. Police Board*, 327 Ill. App. 3d 36, 46, 762 N.E.2d 577, 586 (2001). Because it is an administrative agency, the Board's findings of fact "shall be held to be prima facie true and correct" on review (735 ILCS 5/3—110 (West 1998)) and should be sustained unless the reviewing court determines that those findings are contrary to the manifest weight of the evidence. *Ruther v. Hillard*, 306 Ill. App. 3d 997, 1005, 715 N.E.2d 772, 778 (1999); *Launius v. Board of Fire & Police Commissioners*, 151 Ill. 2d 419, 427, 603 N.E.2d 477, 481 (1992). An agency decision is contrary to the manifest weight of the evidence only if, after viewing the evidence in the light most favorable to the agency, we conclude that no rational trier of fact could have agreed with the agency's decision and an opposite conclusion is clearly evident. *S.W. v. Department of Children & Family Services*, 276 Ill. App. 3d 672, 681, 658 N.E.2d 1301, 1308 (1995); *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88, 606 N.E.2d 1111, 1117 (1992).

## UNJUSTIFIED USE OF FORCE BY DANIELS
## AT 95TH STREET

■ The Board's factual determinations that the officers were not in danger from being run over by Smith's car are supported by the record. Having found that the officers were not in danger from Smith's car, the Board necessarily held that Daniels was unjustified in shooting at the car pursuant to General Order 86—8, thereby violating Rules 2, 6 and 38. An unjustified shooting endangers citizens and discredits the department (violation of Rule 2), violates a written general order (violation of Rule 6) and results in the unnecessary use of a weapon (violation of Rule 38). Accordingly, we affirm the Board's determination that Daniels' use of force at 95th Street was unjustified and a violation of Rules 2, 6, and 38.

## UNJUSTIFIED USE OF FORCE BY DANIELS
## AT 64TH STREET

■ The Board determined that, even if Daniels' testimony was fully credited, her use of deadly force against Haggerty was not warranted in light of all the evidence presented and her belief that it was warranted was not objectively reasonable. Accordingly, the Board found Daniels' use of deadly force against Haggerty was in violation of General Order 86—8 because she shot Haggerty without justification, thereby violating Rules 2 (discrediting the department), 6 (violating a written order) and 38 (resulting in the unnecessary use of a weapon). We affirm, finding these determinations supported by the record.

## DANIELS' FAILURE TO TERMINATE THE CHASE
## AND TO REPORT SHOTS FIRED

■ The record supports the Board's determination that Daniels was guilty of disobeying the order to terminate the chase and of failing to communicate all relevant information regarding the shots fired at 95th Street and the concomitant violations of Rules 2 and 6. We affirm the Board's findings on these counts.

## DANIELS' SANCTION

■ The Board's findings of fact with regard to Daniels were not against the manifest weight of the evidence and those findings were sufficient to warrant Daniels' discharge. Accordingly, we affirm the decision of the trial court with regard to Daniels' discharge.

## BOARD'S FINDINGS REGARDING CARTER

Given Carter's failure to follow a direct order to terminate a chase and his violation of a written order to report a shooting without delay, a one-year suspension from duty is entirely reasonable given the seriousness of his conduct and its consequences. We reinstate his suspension.

## DUE PROCESS

Notwithstanding the petitioners' arguments to the contrary, we do not find that the Board's consolidation of the four officers' cases, the pretrial publicity accorded the Haggerty case and the failure of any of the Board members to attend the administrative hearing deprived either Daniels or Carter of his or her right to be tried fairly.

### 1. Consolidation

■ Due process requirements differ in judicial and administrative proceedings because administrative proceedings are simpler and less formal and technical than judicial proceedings. *Desai v. Metropolitan Sanitary District of Greater Chicago*, 125 Ill. App. 3d 1031, 1033, 466 N.E.2d 1045, 1047 (1984). Due process in an administrative proceeding is satisfied by a " 'procedure that is suitable and proper to the nature of the determination to be made and conforms to fundamental principles of justice.' " *Comito v. Police Board*, 317 Ill. App. 3d 677, 687, 739 N.E.2d 942, 949 (2000), quoting *Telcser v. Holzman*, 31 Ill. 2d 332, 339, 201 N.E.2d 370, 374-75 (1964). That procedure must include impartial rulings on the evidence, an opportunity to be heard, and the right to cross-examine adverse witnesses. *Comito*, 317 Ill. App. 3d at 687, 739 N.E.2d at 949, citing *Abrahamson*, 153 Ill. 2d at 95, 606 N.E.2d at 1120. An administrative body has broad discretion in conducting its hearings but that discretion must be exercised judiciously and not arbitrarily. *Comito*, 317 Ill. App. 3d at 687, 739 N.E.2d at 949.

■ "[T]he consolidation of separate causes for trial is discretionary with the trial court and our courts have found no abuse of discretion where the separate causes are of the same nature, arise from the same act, event or transaction, involve the same or like issues, and depend largely or substantially upon the same evidence, and when a joint trial will not give one party an undue advantage or prejudice the substantial rights of any party." *Peck v. Peck*, 16 Ill. 2d 268, 275, 157 N.E.2d 249, 254 (1959), citing *Black Hawk Motor Transit Co. v. Illinois Commerce Comm'n*, 383 Ill. 57, 66-67, 48 N.E.2d 341, 346 (1943). Similarly, administrative bodies performing quasi-judicial functions have the discretion to consolidate cases for hearing and, unless that discretion is abused, reviewing courts will not interfere with an agency's decision regarding consolidation. *Black Hawk Motor Transit Co.*, 383 Ill. at 66, 48 N.E.2d at 346. If an abuse of discretion is found, the reviewing court must then determine "whether the result was injurious or prejudicial to appellant's right to a fair and impartial hearing." *Black Hawk Motor Transit Co.*, 383 Ill. at 66, 48 N.E.2d at 346.

■ In this case, the same incidents gave rise to the charges against

all four officers, many of the same charges were raised against each officer, the same witnesses would likely testify in all four cases and the four officers would be called to testify against each other given that they confronted shared circumstances. There is no evidence that any officer was denied the right to cross-examine any of the witnesses or an opportunity to be heard. In fact, having examined the report of proceedings for the entire six-day hearing, it is clear that each officer had ample opportunity to examine each witness and to present his or her case. Moreover, all four officers were represented by the same attorney and their defenses were not inconsistent. Given the common issues of law and fact, we find no abuse of discretion in the Board's decision to consolidate the cases.

As Daniels correctly states, each officer's perception of the facts confronting them was unique. However, whether an officer's perception of the facts was reasonable can only be determined by looking at the entirety of the circumstances confronting that officer. This totality of circumstances can only be determined by examining not only the officer's testimony but that of any other witnesses to the incident, including the testimony of other officers present. At any given point in time, the facts confronting each officer were shared by anyone else present at that moment in time; they were not unique to that officer. Although each witness's perceptions of the facts might vary, each witness's account of the same factual scenario should be considered.

Consolidation of the cases did not prejudice Carter and Daniels due to any disparities in the evidence that confronted each officer. "Without a showing to the contrary, State administrators 'are assumed to be men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances.' " *Scott v. Department of Commerce & Community Affairs*, 84 Ill. 2d 42, 55, 416 N.E.2d 1082, 1089 (1981), quoting *United States v. Morgan*, 313 U.S. 409, 421, 85 L. Ed. 1429, 1435, 61 S. Ct. 999, 1004 (1941). As the hearing officer noted, a Board hearing is more akin to a bench trial than a jury trial and the Board is more than capable of sorting the evidence and applying it to whichever officer is relevant.

The Board is presumed to be able to judge each case on the basis of the evidence uniquely applicable to each case, and Daniels and Carter have presented no evidence that the Board did not do so or that they were prejudiced in any way. Daniels argues that the Board based its finding that she was unjustified in her use of force in shooting Haggerty on Wilson's testimony rather than on her own. However, credibility of the officer is always an issue and all factual evidence must be considered, not just the testimony of the officer being charged.

Moreover, the Board clearly stated that, even giving full credit to Daniels' testimony, her use of deadly force was not justified because "there was simply no threat of imminent harm from Ms. Haggerty." Daniels was clearly not prejudiced by the consolidated hearings.

Carter states that he was found guilty of failing to report shots fired at 95th Street despite the fact that he fired no shots and his radio was not operating, and he asserts that he should not have been tried under the same circumstances as the other officers because he did not fire his weapon. As discussed previously, General Order 99—01 requires that an officer report shots fired by any other officer. The Board found that Carter did not do so, either during the pursuit via Wilson's radio or in person at 64th Street. Moreover, the Board took Carter's failure to discharge his weapon into account, stating that Carter's culpability was less than the other officers because he did not discharge his weapon at either location. It, therefore, ordered only a one-year suspension, rejecting the superintendent's request that Carter be discharged. Carter was clearly not prejudiced by the consolidated hearings.

## 2. Publicity

■ As in judicial proceedings, due process requires that an impartial tribunal adjudicate in administrative proceedings. *Collura v. Board of Police Commissioners*, 113 Ill. 2d 361, 369, 498 N.E.2d 1148, 1152 (1986). Daniels argues that the Board was not impartial given the adverse pretrial publicity her case received. However, "[a] mere possibility of prejudice is insufficient to show that a board, or any of its members, was biased." *Collura*, 113 Ill. 2d at 370, 498 N.E.2d at 1152. In *Grissom v. Board of Education of Buckley-Loda Community School District No. 8*, 75 Ill. 2d 314, 388 N.E.2d 398 (1979), our supreme court held:

> " 'Mere familiarity with the facts of a case gained by an agency in the performance of its statutory role does not, however, disqualify a decisionmaker. [Citations.] Nor is a decisionmaker disqualified simply because he has taken a position, even in public, on a policy issue related to the dispute, in the absence of a showing that he is not "capable of judging a particular controversy [fairly] on the basis of its own circumstances." ' " *Grissom v. Board of Education of Buckley-Loda Community School District No. 8*, 75 Ill. 2d 314, 320, 388 N.E.2d 398, 400 (1979), quoting *Hortonville Joint School District No. 1 v. Hortonville Education Ass'n*, 426 U.S. 482, 493, 49 L. Ed. 2d 1, 9, 96 S. Ct. 2308, 2314 (1976), quoting *United States v. Morgan*, 313 U.S. 409, 421, 85 L. Ed. 1429, 1435, 61 S. Ct. 999, 1004 (1941).

If a decisionmaker is deemed qualified to judge a controversy wherein

he has taken a policy position or of which he knows the facts prior to the hearing, it is highly unlikely that a board's exposure to pretrial publicity would suffice to disqualify a board or its members from judging a particular case. As discussed previously, without a showing to the contrary, state administrators such as the Board's members are assumed to be " 'capable of judging a particular controversy fairly on the basis of its own circumstances.' " *Scott*, 84 Ill. 2d at 55, 416 N.E.2d at 1089, quoting *Morgan*, 313 U.S. at 421, 85 L. Ed. at 1435, 61 S. Ct. at 1004. Daniels and Carter made no such showing here.

### 3. Failure to Attend Hearing

■ In order for due process to be satisfied in administrative proceedings, absent express statutory language to the contrary, the agency members making the final decision need not be present when the evidence is taken as long as they consider the evidence in the report of proceedings before the hearing officer and base their findings and recommendations thereon. *Abrahamson*, 153 Ill. 2d at 95-96, 606 N.E.2d at 1120; *Homefinders, Inc. v. City of Evanston*, 65 Ill. 2d 115, 128, 357 N.E.2d 785, 791 (1976). If the evidence before a hearing officer is in such conflict that the weight and credibility of the witnesses' testimony is the determining factor in the case, due process may require that the hearing officer participate in the Board's decision by submitting a report of his conclusions and impressions. *Ruther v. Hillard*, 306 Ill. App. 3d 997, 1005, 715 N.E.2d 772, 778 (1999); *Serio v. Police Board*, 275 Ill. App. 3d 259, 266, 655 N.E.2d 1005, 1010 (1995).

The Board stated in its "Findings and Decision":

"[T]he members of the Police Board read and reviewed the certified transcript of the proceedings of the hearing, as well as all of the exhibits admitted into evidence. Thomas E. Johnson, Hearing Officer, made an oral report and conferred with the Police Board about the evidence and the credibility of the witnesses before the Board rendered its decision."

Due process requirements were clearly met here because the Board heard an oral report from the hearing officer; conferred with the hearing officer; discussed witness credibility with him; reviewed the evidence in the case; and, as shown by the 15-page factual analysis in the Board's written decision, based its findings on all of this information. Accordingly, the Board members' absence from the hearing did not deny Daniels and Carter due process of law. See *Ruther*, 306 Ill. App. 3d at 1005, 715 N.E.2d at 778.

For the reasons stated above, we affirm the trial court's decision with regard to Daniels and, accordingly, the Board's decision to discharge Daniels. We reverse the decision of the trial court with

regard to Carter and reinstate the Board's decision to suspend Carter from his duties for one year.

Affirmed in part; reversed in part.

THEIS, P.J., and HARTMAN, J., concur.